UNIFOUR CONSTRUCTION SERVICES, INC. D/B/A EXTRAORDINARY KITCHENS, DAVID B. NEWTON, AND NANCY B. NEWTON, PLAINTIFFS v. BELLSOUTH TELECOMMUNICATIONS, INC., AND FIRST SOUTH CONSTRUCTION, INC., DEFENDANTS

No. COA02-1640

(Filed 20 April 2004)

**1. Appeal and Error— preservation of issues—appellate rules—appendix of brief—portions of transcript**

N.C. R. App. P. 28(d)(1)(b) requires an appellant to include in the appendix to his brief those portions of the transcript showing the pertinent questions and answers when a question presented in the brief involves the admission or exclusion of evidence. Compliance by the parties facilitates review of such issues by all three members of the panel since only one complete transcript is filed with the Court, but all three panel members receive copies of the briefs.

**2. Evidence— cross-examination—speculation—negligence claims—harmless error**

Plaintiffs are not entitled to a new trial on their negligence claims even though the trial court limited their cross-examination of several of defendants' expert witnesses, because: (1) the trial court properly declined to allow an expert to speculate about someone else's observations; (2) one of the questions complained about had previously been answered; and (3) any erroneous rulings excluding proper questions on cross-examination were harmless when the jury returned a verdict finding that defendants' negligence did cause damage.

### 3. Unfair Trace Practices; Damages and Remedies— misrepresentation of intent to perform act—fraud—sufficiency of evidence

Plaintiffs' evidence was sufficient for the jury on claims for unfair or deceptive trade practices under N.C.G.S. Ch. 75 and punitive damages under N.C.G.S. § 10-15 in their action against defendant telecommunications company and defendant construction company alleging that damages to their property were caused by drilling and installation of cable on adjacent property owned by defendant telecommunications company where plaintiffs' evidence tended to show: (1) defendant telecommunications company assured plaintiffs that no problems would be encountered by the drilling and cable installation and that if problems did arise, any damage to plaintiffs' property would be remedied by defendants; and (2) neither defendant had any intention to follow through on such assurances. The statement of an intention to perform when no such intention exists may constitute fraud when the other elements of fraud are present.

Appeal by plaintiffs from order entered 27 February 2002 and judgment entered 12 March 2002 by Judge Claude S. Sitton in the Superior Court in Burke County. Heard in the Court of Appeals 17 September 2003.

*C. Gary Triggs, for plaintiff-appellants.*

*Cogburn, Goosmann, Brazil & Rose, P.A., by Andrew J. Santaniello and Frank J. Contrivo, Jr., for defendant-appellees.*

HUDSON, Judge.

On 26 February 1999, plaintiffs, Nancy Newton (Mrs. Newton) and her son David, filed suit alleging negligence, tortious interference with plaintiff's business, interference with the quiet enjoyment of their property, and unfair or deceptive trade practices on the part of defendants. The jury found that plaintiff Nancy Newton's property was damaged by the acts of defendants in the amount of $6,000, and found that David Newton's property and business were not damaged by defendants. Plaintiffs appeal. For the reasons discussed below, we conclude that no prejudicial error affected the claims tried, but that plaintiffs are entitled to a trial on their claims pursuant to G.S. § 75-1.1, *et. seq.*

UNIFOUR CONSTR. SERVS., INC. v. BELLSOUTH TELECOMM., INC.

[163 N.C. App. 657 (2004)]

On or about 25 May 1995, defendant First South Construction Company, Inc. ("First South") began installing a cross box and cable for defendant Bellsouth Telecommunications, Inc. ("Bellsouth") on property owned by Bellsouth adjacent to property owned by plaintiff Nancy Newton. Mrs. Newton's house and a separate woodworking/cabinet shop operated by plaintiff David Newton ("David") are situated on this property. According to David, he first became aware of the cable project on the day it began, when he went outside and saw the area "full of First South trucks and trailers and [a] couple [of] cars around and [a] backhoe sitting in our front yard and [the] front yard was full of people." David estimated that as many as twenty people were in the yard at one point.

David went out to address the situation and, in his words, "[i]t got acrimonious real quick." Mrs. Newton asked the First South crew to move, but they refused. David then asked them to remove their vehicles from the property. After a two-hour argument that ultimately involved members of the local sheriff's department, First South moved their vehicles off the Newton property and onto Bellsouth's adjacent right-of-way. David complained to Bellsouth, who eventually agreed to build a fence to lessen the noise along the edge of the Newton's property.

In a four-page letter faxed to Bellsouth, David confirmed the agreement and also warned Bellsouth of potential problems that could arise from working on that particular tract. He informed them that the house and cabinet shop were situated above subterranean quartz bedrock and warned of the damage that could result if the bedrock were disturbed. Mr. Newton testified that in the course of sixteen or eighteen conversations, Bellsouth repeatedly assured him and his mother that no mistakes would be made and that Bellsouth would "see to it that First South took care of" any problems. In addition, the parties signed a written agreement in which Bellsouth was to "cut the site level with [the Newton's] yard—taking out existing trees, etc. as needed and to build a fence for noise abatement and site appearance that matches the existing fence on the Newton property within reason."

On or about 28 July 1995, First South began to bore a cable trench under the road using a pneumatic device called a "mole." David was in the cabinet shop at the time, when fluorescent bulbs shook loose and fell, and "[e]verything on the work bench was cascading in the floor." Alarmed, he headed to the house and heard "wham, wham, wham, wham. Whole top of the hill was moving." In the house, every-

thing was moving and falling. The vibration lasted 35 to 40 minutes, during which time Mrs. Newton was "absolutely terrified." She likened it to an earthquake. Books fell from shelves and windows broke, and the house moved on its foundation.

David went to the work site, reported the damage and asked First South to stop. Baxter Hayes, First South's supervisor, replied, "I don't care what it tears up, who it hurts, or what it costs." Only after sheriff's deputies arrived did the crew stop the drilling and leave.

Max Watts, an engineer and expert in contracting and house inspections, testified about the damage to the house and shop, and concluded that the vibration likely caused the damage. He testified "to a reasonable certainty" that the vibrations from the boring operation caused the damage he observed to the house and shop.

Watts inspected the house and shop twice: once a few months after the initial damage and again in 1997 to determine whether the problems were static or ongoing. After the second inspection, he determined that the situation was not stable. He estimated that it would cost $100,000 to re-stabilize the house, and $150,000 to bring the shop back to its original condition. Without stabilizing the foundations, Watts testified, any repairs to the buildings would be temporary. He testified that cosmetic repairs, without re-stabilization, would be a waste of money, but would cost approximately $50,000.

After he contacted Bellsouth about the damage, David received a reply informing him that only First South was responsible, and that Bellsouth would not pay for the damage. Mr. Newton invited representatives from both Bellsouth and First South to inspect the damage. Tom Beggs, defendants' geotechnical engineer, inspected the house once in 2000. In Beggs' opinion, the extensive damage to plaintiffs' house and shop was not caused by vibration, and was cosmetic, rather than structural. He estimated that cosmetic repairs to the house would cost between $3,000 and $5,000. The jury found that Mrs. Newton's property was damaged by defendants' negligence, that David's property was not, and awarded $6,000 to Mrs. Newton. The court entered judgment accordingly, but, with the agreement of the parties, ordered that $3,000 be held by the clerk of court to protect the interests of Mrs. Newton's long-estranged husband. Plaintiffs appeal.

UNIFOUR CONSTR. SERVS., INC. v. BELLSOUTH TELECOMM., INC.

[163 N.C. App. 657 (2004)]

Analysis

Plaintiffs first argue that they are entitled to a new trial on all claims because the trial court limited their cross examination of several of defendants' expert witnesses, which prejudiced them. As discussed below, we agree in part.

[1] We note initially that the appellants have not complied with Appellate Rule 28(d)(1)b, which requires that appellant include in the appendix to his brief "those portions of the transcript showing the pertinent questions and answers when a question presented in the brief involves the admission or exclusion of evidence." N.C. R. App. P. 28(d)(1)(b). Defendants did not raise this issue, but we mention it on our own to draw attention to this oft-ignored provision of the Rules. Compliance by the parties is valuable because it facilitates review of such issues by all three members of the panel, in that only one complete transcript is filed with the Court, but all three panel members receive copies of the briefs.

[2] Turning to the plaintiffs' argument, the decision to grant or deny a motion for a new trial or to set aside a jury verdict rests in the sound discretion of the trial court, and such a ruling will not be disturbed on appeal absent a manifest abuse of that discretion. *Coletrane v. Lamb*, 42 N.C. App. 654, 656, 257 S.E.2d 445, 447 (1979).

The North Carolina Rules of Evidence provide that the court shall exercise reasonable control over the interrogation of witnesses and the presentation of expert opinion evidence "so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." N.C.G.S. § 8C-1, Rule 611(a). Regarding hypothetical questions, the rules of evidence provide, in pertinent part, as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field . . ., the facts or data need not be admissible in evidence.

G.S. § 8C-1, Rule 703. Additionally, Rule 705 provides in pertinent part that:

> There shall be no requirement that expert testimony be in response to a hypothetical question.

G.S. § 8C-1, Rule 705. Our Courts have held further that even the omission of a material fact from a hypothetical question does not necessarily render the question objectionable, or the answer incompetent. *See Robinson v. J. P. Stevens*, 57 N.C. App. 619, 622, 292 S.E.2d 144, 146 (1982). It is left to the cross-examiner to bring out facts supported by the evidence that have been omitted and thereby determine if their inclusion would cause the expert to modify or reject his or her earlier opinion. *Id.* at 623, 292 S.E.2d at 146.

First, the trial court sustained objections to certain questions during the cross-examination of defendants' expert engineer, Steve Morris. Before the first such instance, testimony had shown that plaintiffs' engineer, Max Watts, crawled under the house and observed that the structural integrity of the piers had been compromised. Mr. Morris testified that he did not crawl under the house to observe these piers, thus prompting plaintiffs' counsel to ask:

Q. So if a person—a colleague of yours, person in the same type of business, did crawl under there and did test those [piers], would you believe that that's probably what was observed?

THE COURT: Well, the Court on its own SUSTAINS the objection.

In this ruling, the Court properly declined to allow Mr. Morris to speculate about someone else's observations regarding the structural integrity of the piers. Plaintiffs' argument as to this ruling is without merit.

Shortly thereafter, plaintiffs' counsel asked Mr. Morris whether a large vibration affecting the structure of the piers could have affected the integrity of the foundation of the house. The court sustained defense counsel's objection to this question. Only three questions later, plaintiffs' counsel asked Mr. Morris:

Q. Now, if, in fact, you were to find that those piers under the house had been structurally impaired as a result of vibration, could or would, in your opinion, that affect the structural integrity of that house?

Again, the trial court sustained defense counsel's objection. The trial court also sustained an objection to the very next question that asked Mr. Morris again whether an impairment of the integrity of the piers might have affected the "overall structural stability of the structure that those piers were supporting." We are unable to conclude that the trial court abused its discretion in these rulings.

UNIFOUR CONSTR. SERVS., INC. v. BELLSOUTH TELECOMM., INC.

[163 N.C. App. 657 (2004)]

Later in Mr. Morris' testimony, the trial court disallowed two questions asking whether Mr. Morris looked for a rock outcropping on the property in the vicinity of the vibration:

Q. Now, if you were out there to discover what the problems were, don't you think it would be rather important to go and see if there was, in fact, an outcropping of rock where this bore took place that you were being told by a homeowner is what was hit and caused vibration?

A. Not specifically, no.

Q. Wasn't important to what you were doing?

A. That's correct.

Q. It was certainly important to what he was claiming.

[Defense counsel]: Objection.

Q. Wasn't it?

THE COURT: Sustained.

Q. Well, did you think that it was significant to check that out if, in fact, you were up there to determine the truth and whatever was going on if the person that you were talking with that was giving you the information that you've told us is important to collect was telling you that there's an outcropping of rock that was hit that caused this vibration that caused the damage?

[Defense counsel]: Objection. Asked and answered.

THE COURT: Sustained.

Here, the court properly sustained both objections; the first was to a statement by counsel, and the second correctly concluded that, as these excerpts reveal, the question was previously answered. We reject plaintiffs' arguments as to these rulings.

However, the court also disallowed a question asking whether it would be reasonable before drilling to investigate whether the presence of a large vein of rock in the area could possibly cause damage if struck by the drill:

Q. Based on your experience in that field, if you had a client or if you, in construction side of the job, were advised in writing that there was a large quartz vein that if you hit it in a drilling operation could or might cause damage, would you think that it would

be reasonable within your trade to investigate that prior to beginning drilling operation in that area?

[Defense counsel]: Objection.

THE COURT: Sustained.

Finally, the court disallowed two questions to Mr. Morris about a broken a window:

Q. Now, do you have an explanation for why a window that's not broken when the house started shaking and immediately thereafter is broken breaks?

[Defense counsel]: Objection.

THE COURT: Sustained.

***

Q. If you were to find from the evidence that the window, as depicted in your 3-L, immediately before the vibration was not broken and immediately after the vibration was broken, what would you conclude from that?

[Defense counsel]: Objection.

THE COURT: Sustained.

Defendants contend that these were improper hypothetical questions in that they did not contain sufficient factual background. We conclude, that while these questions may not have been model hypothetical questions, they posed appropriate questions for the expert based on matters in evidence. As to the questions regarding the piers, Max Watts testified that he inspected the piers under the house and found that the piers had shifted and that the entire house had moved diagonally on the foundation, which he concluded resulted from strong vibrations. There were also facts in evidence underlying plaintiffs' questions regarding the rock outcropping; David Newton testified that there was a large rock outcropping where the drilling took place and Max Watts testified as to the existence of the rock and the role it could play in transmitting vibrations from the drilling site to the house. David also testified about windows breaking.

In addition to these rulings during Morris' testimony, the trial court also limited plaintiffs' cross-examination of defendants' geotechnical engineer, Tom Beggs. For instance, the trial court sustained an objection to plaintiffs' question asking Mr. Beggs if he would be

surprised that rock had been hit by the drill, although Mr. Beggs testified on direct that there were no rock formations on the property. Nor was counsel allowed to ask whether the operator of the boring device should have recognized the difference between hitting rock and drilling through dirt. And finally, plaintiffs' counsel was not allowed an answer to his question to Mr. Beggs asking whether the vibration caused damage to the house, although he testified on direct that the vibration had not caused the damage.

We conclude from the evidence as a whole that these questions were appropriate cross-examination, and the rulings excluding them were in error. The defendants have cited three cases to support their argument and all three arose under a previous version of the rule, which did require hypothetical questions. *See Powell v. Parker*, 62 N.C. App. 465, 303 S.E.2d 225 , *cert. denied*, 309 N.C. 322, 307 S.E.2d 166 (1983); *Goble v. Helms*, 64 N.C. App. 439, 307 S.E.2d 807 (1983), *cert. denied*, 310 N.C. 625, 315 S.E.2d 690 (1984); *Dean v. Coach Co.*, 287 N.C. 515, 215 S.E.2d 89 (1975). The pertinent rules have provided since 1982 that there is "no requirement that expert testimony be in response to a hypothetical question." G.S. § 8C-1, Rule 705.

These questions to Mr. Morris addressed the extent of his investigation, and his opinions based thereon, as to whether the house sustained structural damage. However, the jury returned a verdict finding that the defendants' negligence did cause damage to Mrs. Newton's property (the house and/or the shop), apparently believing the opinions of plaintiffs' expert Max Watts, and awarded damages of $6,000. Thus, we hold that these erroneous rulings are harmless and do not entitle plaintiffs to a new trial on their claims based on negligence.

[3] Plaintiffs next argue that the trial court erred in dismissing their claim for unfair or deceptive trade practices pursuant to Chapter 75 and their claim for punitive damages. For the following reasons, we agree.

To establish a violation of Chapter 75, plaintiff must show (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury. *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681, *reh'g denied*, 352 N.C. 599, 544 S.E.2d 771 (2000). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. [A] party is guilty of an unfair act or practice when

it engages in conduct that amounts to an inequitable assertion of its power or position." *Coble v. Richardson Corp.*, 71 N.C. App. 511, 520, 322 S.E.2d 817, 823-24 (1984) (citations omitted). Moreover, an act or practice is deceptive if it has the capacity or tendency to deceive. *Horack v. Southern Real Estate Co.*, 150 N.C. App. 305, 310, 563 S.E.2d 47, 51 (2002). Proof of actual deception is not required. *Id.*

A "[s]imple breach of contract . . . [does] not qualify as [a violation of Chapter 75], but rather must be characterized by some type of egregious or aggravating circumstances before the statute applies." *Norman Owen Trucking v. Morkoski*, 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (1998). In *Mosley & Mosley Builders v. Landin Ltd.*, 97 N.C. App. 511, 389 S.E.2d 576, *disc. review denied*, 326 N.C. 801, 393 S.E.2d 898 (1990), this Court held that a breach of contract accompanied by fraud or deception constitutes an unfair or deceptive trade practice. *Id.* at 518, 389 S.E.2d at 580.

Our Supreme Court has held (1) that the statement of an intention to perform an act, when no such intention exists, constitutes misrepresentation of the promisor's state of mind, an existing fact, and as such may furnish the basis for an action for fraud if the other elements of fraud are present, *Roberson v. Swain*, 235 N.C. 50, 55, 69 S.E.2d 15, 19 (1952); *see also Wilkins v. Finance Co.*, 237 N.C. 396, 75 S.E.2d 118 (1953); and (2) that proof of fraud necessarily constitutes a violation of the statutory prohibition against unfair and deceptive acts, *Hardy v. Toler*, 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975).

Here, when David Newton complained to Bellsouth about First South's intrusion on their property, he and Bellsouth, through an agent of Bellsouth, reached an agreement whereby Bellsouth would build a fence along the edge of the property to baffle the noise. Further, evidence showed that Mr. Newton was repeatedly assured by representatives of Bellsouth that no problems would be encountered, and that if any were, they would see to it that First South remedied any damage done to the property.

Other testimony tended to show that neither Bellsouth nor First South had any intention to follow through on either assurance. For example, First South's supervisor, Baxter Hayes, testified that he had no communication with Bellsouth regarding any agreement with Mr. Newton. Mr. Hayes also stated that "Bellsouth instructed us to do that job and, when we encountered problems with Mr. Newton, we talked to Bellsouth and Bellsouth said to proceed." David's testi-

mony about Mr. Hayes' response to his report of damage, that "[he didn't] care . . ." supports this as well.

Plaintiffs presented evidence that tended to show that, despite its representations to David, Bellsouth had never intended to fulfill its agreement, except for building a small fence along the property line. Indeed, after the incident involving the vibration, Mr. Newton contacted Bellsouth and received a reply letter stating that "As you were advised, First South is responsible for the investigation and settlement, if necessary, of claims resulting from the work which they perform under contract for BellSouth."

In ruling on a motion for a directed verdict,

The question raised [] is whether the evidence is sufficient to go to the jury. In passing upon such motion the court must consider the evidence in the light most favorable to the non-movant. That is, the evidence in favor of the non-movant must be deemed true, all conflicts in the evidence must be resolved in his favor and he is entitled to the benefit of every inference reasonably to be drawn in his favor. It is only when the evidence is insufficient to support a verdict in the non-movant's favor that the motion should be granted.

*Dockery v. Hocutt*, 357 N.C. 210, 217, 581 S.E.2d 431, 436 (2003) (citations and internal quotation marks omitted).

We believe that this evidence, taken in the light most favorable to plaintiffs, is sufficient to go to the jury on a claim under Chapter 75, as to both defendants. The same evidence is also sufficient to establish plaintiffs' claim for punitive damages pursuant to G.S. § 1D-15.

### Conclusion

For the foregoing reasons, we hold that any error by the trial court excluding evidence was harmless. We also hold that the trial court erred by granting defendants' motion for directed verdicts regarding plaintiffs' claim under Chapter 75 and claim for punitive damages, and that plaintiffs are entitled to a trial on these issues.

Affirmed in part, reversed in part, and remanded.

Judges TIMMONS-GOODSON and ELMORE concur.