State *ex rel.* Long v. Custard, 2007 NCBC 26

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | 06 CVS 4622 |

STATE OF NORTH CAROLINA, on relation of
James E. Long, Commissioner of Insurance, AS
LIQUIDATOR OF COMMERCIAL
CASUALTY INSURANCE COMPANY OF
NORTH CAROLINA,

                  Plaintiffs,

     v.

J. RICHARD CUSTARD; WENDY J.
CUSTARD; E. NIMOCKS HAIGH; and
DELTA INSURANCES SERVICES, INC.,

                  Defendants.

**ORDER ON DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

{1}    This case arises out of Plaintiff's suit for breach of fiduciary duty, violation of Articles 7 and 19 of the North Carolina Insurance Law, and unfair or deceptive acts or practices under section 75-1.1 of the General Statutes of North Carolina. This matter comes before the Court on Defendants' Motion to Dismiss for Failure to State a Claim.

{2}    After considering the briefs and oral arguments, the Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss. Specifically, the Court concludes the following:

1. Claims of breach of fiduciary duty arising out of actions taken by Defendants prior to March 1, 2001 are barred by the statute of limitations. The actions alleged to have taken place prior to March 1, 2001 do not support claims of breach of the duty of loyalty that might be salvaged if the doctrine of adverse domination were applied.

2. Defendants were not subject to Chapter 75 of the General Statutes of North Carolina until Defendant Commercial Casualty Insurance

Company of North Carolina ("CCIC") was redomesticated in North Carolina in December of 2001. There can be no claims for unfair or deceptive acts or practices arising out of actions occurring prior to CCIC's redomestication in North Carolina.

The remaining claims, on which the parties may conduct discovery, are as follows:

1. Claims for breach of fiduciary duty based on actions taken by Defendants after March 1, 2001.

2. Claims for unfair or deceptive acts or practices under Chapter 75 arising out of actions occurring after CCIC's redomestication in North Carolina in December 2001.

*Nelson Mullins Riley & Scarborough LLP by Joseph W. Eason, Christopher J. Blake, and Leslie Lane Mize; Bode, Call & Stroupe, LLP by V. Lane Wharton, Jr.; Office of the Attorney General by David W. Boone for Plaintiff.*

*Hunton & Williams LLP by Steven B. Epstein and John D. Burns for Defendants.*

Tennille, Judge.

## I.

## PROCEDURAL BACKGROUND

{3} This action was filed in Wake County Superior Court on March 31, 2006. The matter was designated a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated May 3, 2006 and subsequently assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Special Superior Court Judge for Complex Business Cases dated May 8, 2006.

{4} Defendants filed a Motion to Dismiss for Failure to State a Claim on January 22, 2007. The Court heard oral arguments on the motion on March 27, 2007.

## II.

## THE PARTIES

{5}    Plaintiff James E. Long is the North Carolina Commissioner of Insurance. He brings this action in his capacity as the duly appointed liquidator of CCIC, and on behalf of the creditors and policyholders of CCIC under sections 58-30-120(12) and 58-30-120(13) of the General Statutes of North Carolina.

{6}    CCIC is a property and liability insurance corporation originally organized under the laws of the State of Georgia.  CCIC was redomesticated as a North Carolina corporation on or about December 19, 2001.  The Wake County Superior Court entered an Order of Liquidation against CCIC on April 2, 2004 and appointed Plaintiff as liquidator.

{7}    Defendant A. Richard Custard is a resident of the State of Georgia.  At times relevant to this action, Mr. Custard was a member of the board of directors and chief executive officer of CCIC.

{8}    Defendant Wendy J. Custard is the wife of Defendant A. Richard Custard and is also a resident of the State of Georgia.  At times relevant to this action, Mrs. Custard was a member of the board of directors and secretary of CCIC.

{9}    Defendant E. Nimocks Haigh is a resident of Iredell County, North Carolina.  At times relevant to this action, Haigh was a member of the board of directors and president of CCIC.

{10}   Defendant Delta Insurance Services, Inc. ("Delta") is a corporation organized and existing under the laws of the State of Georgia.  At times relevant to this action, Delta owned all the outstanding shares of stock of CCIC.

{11}   Plaintiff alleges that at times relevant to this action, Haigh and the Custards were officers of Delta.  Haigh owned approximately five percent of Delta, the Custards were members of the board of directors, and Mr. Custard owned a controlling interest in Delta.

III.

MOTION TO DISMISS

A.

FACTUAL ALLEGATIONS

{12}   In ruling upon the pending motions, the Court is called upon to determine the appropriate statutes of limitation and apply them to the facts alleged in the Amended Complaint.  The application of the statutes of limitation is critical not just for substantive liability but also for purposes of discovery.  The Commissioner has asserted claims which would entail discovery covering eight to ten years depending on the application of the statutes.  The activities alleged to constitute both breaches of fiduciary duty and unfair trade practices span the spectrum from poor business decisions to bad faith and conscious disregard of policyholders' interests and disloyalty.  The activities have different consequences depending upon whether they occurred before or after March 1, 2001—the date before which claims of breach of fiduciary duty are barred.  December 19, 2001, the date that CCIC was redomesticated in North Carolina, is also critical.

1.

CIA AND THE FORMATION OF CCIC

{13}   Prior to the formation of CCIC, Mr. Custard owned or controlled Custard Insurance Adjusters, Inc. ("CIA") and was engaged in the business of adjusting claims for property and casualty insurance companies across the country.  CIA is "one of the largest independent loss adjusting companies in the United States and Puerto Rico," and provides "true multi-line adjusting, third-party administration and risk management services."  (First Am. Compl. ¶ 10.)

{14}   CCIC was formed by the Custards in 1988 as a property and casualty insurance company in the State of Georgia.  (First Am. Compl. ¶ 9.)  Delta was the sole shareholder of CCIC.  (First Am. Compl. ¶ 9.)  Plaintiff alleges the Custards' primary goal in organizing CCIC was to provide a source of claims for CIA to adjust, resulting in income and revenue to CIA.  (First Am. Compl. ¶ 11.)

{15}   Haigh joined CCIC as president and a member of the board of directors in 1992.  (First Am. Compl. ¶ 14.)

{16}   From 1988 to 1998, CCIC focused on writing two types of insurance policies:  (1) professional liability insurance for environmental consultants and (2) private passenger automobile liability and physical damage insurance.  Most of CCIC's insureds were located in Florida.  (First Am. Compl. ¶ 13.)

2.

EXPANSION INTO CALIFORNIA

{17}   By 1998, CCIC allegedly began experiencing declines in writings and profitability in both its environmental and automotive insurance policy businesses.  (First Am. Compl. ¶ 15.)  Plaintiff alleges that "[u]ntil the end of 1998, CCIC had generally followed a prudent approach to underwriting insurance, and the amount of premiums that CCIC wrote was reasonable in relation to CCIC's net worth . . . and the business written was generally profitable."  (First Am. Compl. ¶ 16.)

{18}   Mr. Custard and Haigh made a business decision to change CCIC's business direction in late 1998.  CCIC ceased concentrating on its environmental business and instead began to focus on commercial liability for small contractors in California known as artisans.  The artisans insurance business was characterized by small individual insureds with policies having small minimum premiums but large coverage limits.  (First Am. Compl. ¶ 21.)  Neither Mr. Custard nor Haigh had experience in the California market (First Am. Compl. ¶ 19), and so they turned to Edward Maucere for advice (First Am. Compl. ¶ 20).  Maucere was a friend of Mr. Custard's and owned a California-based brokerage operation known as London American General Agency ("London American").  (First Am. Compl. ¶ 20.)  In establishing its artisans insurance business, CCIC copied rates and forms from an existing artisans insurance program in California.  (First Am. Compl. ¶ 21.)  Plaintiff alleges that Mr. Custard and Haigh "knew, or in the exercise of reasonable care should have known, that the insurance market in California was different from, and riskier than, the markets in which [they] were familiar."  (First Am. Compl. ¶ 19.)  Plaintiff also alleges that Mr. Custard and Haigh "failed to direct or

cause CCIC to perform a reasonable 'due diligence' inquiry into writing Artisans Insurance in California, and into the proper rates and forms which should be used." (First Am. Compl. ¶ 22.)

{19}   CCIC worked through three California-based insurance brokers, including London American.  These three California brokers were allowed "the right to underwrite potential insureds, to bind CCIC on policies, to issue policies, and to receive and hold premium funds due to CCIC in an interest-bearing account, with the interest to go to the insurance brokers."  (First Am. Compl. ¶ 23.)  CCIC also allegedly paid favorable, above-market commissions to the California brokers "for meeting certain production levels and for achieving certain profitability targets." (First Am. Compl. ¶ 23.)

{20}   Plaintiff alleges that Mr. Custard and Haigh "failed to exercise reasonable prudence when they made the decision to have CCIC write Artisans Insurance in California as an admitted carrier, rather than an as approved, non-admitted carrier."[1]  (First Am. Compl. ¶ 26.)  The consequence was that "once CCIC's initial rates and forms for Artisans Insurance in California were filed with the California Department of Insurance, it would be difficult and time-consuming to change such rates and forms if they were inadequate."  (First Am. Compl. ¶ 26.)  The election to write as an admitted carrier was allegedly made "because CCIC's size was too small for the California Department of Insurance to allow CCIC to write as a non-admitted carrier." (First Am. Compl. ¶ 26.)  The allegations cited above with respect to entry into the artisan market rise only to the level of negligent business decisions.  They do not implicate bad faith, disloyalty, or conflict of interest.

{21}   The sole allegations relating to the expansion into California which possibly implicate disloyalty, bad faith, or conflict of interest are found in paragraph 24:

> At all times while setting up the Artisans Insurance program for CCIC in California, Haigh and Rick Custard were, upon information and

---

[1] An admitted carrier is an insurance company authorized to sell insurance in a given state.  A non-admitted carrier is not licensed by the state, but can still be allowed to do business in the state by the state's insurance regulator.

> belief, motivated by factors other than the best interests of CCIC. Rick Custard believed that the Artisans Insurance program in California would generate substantial business for offices of his adjusting firm, CIA, which were in need of work, and Haigh stood to gain from increased production of business because his employment contract with Delta and CCIC had bonus provisions which provided Haigh with an incentive to increase the level of premiums written by CCIC.

(First Am. Compl. ¶ 24.)

{22} The allegations of paragraph 24 of the First Amended Complaint are insufficient to support a claim of bad faith, disloyalty, or a conflict of interest. There is nothing inherently wrong with CCIC using CIA, one of the largest adjusting companies in the country. There is nothing inherently wrong with having an employment contract that provides incentives for growing a business. At the heart of Plaintiff's rationale is the premise that the Custards would intentionally generate losses in a small insurance company they owned (CCIC) in order to create work for what was already one of the largest adjusting companies in the country. There are neither facts alleged nor logic which support that premise.

{23} After entering the California market, CCIC's gross premiums written increased from $16.8 million in 1998, to $25.4 million in 1999, and to $32.9 million in 2000. (First Am. Compl. ¶ 27.) Mr. and Mrs. Custard and Haigh allegedly

> failed to exercise any reasonable degree of control over the volume or quality of Artisans Insurance business being written in California, upon information and belief, because of the claims business being generated for CIA in the amounts of millions of dollars per year, and because of the cash flow from the increasing premiums, which were paid in advance of the payment of losses, creating the illusion of profitability for the Artisans Insurance, and for CCIC overall.

(First Am. Compl. ¶ 29.) In sum, Plaintiff alleges that the Custards and Haigh

> knew, or in the exercise of reasonable care should have known, of the problem the California Artisans Insurance business was causing CCIC during 1999, 2000, and 2001, and yet they did not take the steps which prudence would have dictated: (a) to impose limits on writings of Artisans Insurance in California; (b) to impose strict underwriting

control on the brokers; (c) to increase rates; and (d) to curtail writings until CCIC had additional capital and surplus to support the level of its writings.

(First Am. Compl. ¶ 33.)  In sum, Plaintiff's allegations of activities prior to March 1, 2001 constitute only claims of negligent management of CCIC when the Custards and Haigh expanded CCIC's business to the California artisans insurance market. These allegations only support a breach of fiduciary duty claim which is barred by the statute of limitations.  Up to that point, CCIC had not been redomesticated in North Carolina and thus the Defendants were not subject to Chapter 75 claims.

3.

EXPANSION INTO NORTH CAROLINA

{24}  In 2000, CCIC had acquired the automobile liability insurance business of Regency Insurance Company, a North Carolina property and casualty insurer. CCIC had also acquired Regency's offices in Charlotte, North Carolina.  (First Am. Compl. ¶ 34.)  There are no allegations that this expansion of CCIC's business was a breach of fiduciary duty.  The allegations are inconsistent with the allegations that CCIC had changed its business focus.

{25}  Following consideration by Mr. Custard and Haigh, CCIC submitted a Petition for Redomestication to the North Carolina Department of Insurance ("NCDOI") on June 19, 2001.  The Petition indicated the CCIC's reasons for redomestication were (1) the acquisition of Regency's automobile insurance business and a desire to expand its automobile insurance business in North Carolina, and (2) savings on state retaliatory taxes.  (First Am. Compl. ¶ 36.)  The Petition was "supported by financial projections which projected growth in CCIC's Artisan Insurance business and CCIC's North Carolina automobile insurance business at rates of growth that were in line with CCIC's historical performance."  It also indicated that CCIC's principal office would be relocated to Charlotte.  (First Am. Compl. ¶ 37.)

{26}   When NCDOI approved CCIC's Petition on December 19, 2001,  Mr. Custard and Haigh had allegedly "already decided that CCIC would not grow its automobile insurance in North Carolina and had already decided that CCIC's principal office would not be moved to Charlotte, North Carolina." (First Am. Compl. ¶ 38.)  Those decisions are not alleged to have caused the losses alleged in the First Amended Complaint.

{27}   In late 2001, CCIC voluntarily changed its state of incorporation from Georgia to North Carolina and became subject to primary regulation by NCDOI. (First Am. Compl. ¶ 39.)  Thus, up to this point there are insufficient allegations to support an unfair trade practice claim under North Carolina law or damages to North Carolina policyholders under Chapter 75.

4.

WARNING SIGNS AND COLLAPSE

{28}   By late 1999 or early 2000, CCIC employees were allegedly becoming uneasy about the artisans insurance business, and were expressing concerns that this line of business was "risky and unwise." (First Am. Compl. ¶ 31.)

{29}   Plaintiff alleges that from 1999 to 2001, "[t]he amount of Artisans Insurance business written by brokers in California for CCIC continually increased," and that

> it was evident that the business was being poorly underwritten by the brokers, that the brokers were charging fees which were for the benefit of the brokers and not CCIC, and that the growth in the amount of Artisans Insurance written was resulting in poor underwriting results, requiring a change in underwriting guidelines and pricing, and also resulting in a "statutory drain" on CCIC's capital and surplus reported in CCIC's financial statements because of the requirements of accounting for insurance companies for the expensing of commissions and other acquisition costs.

(First Am. Compl. ¶ 32.)

{30}   In 2001 and 2002, there were a number of allegedly troublesome indications regarding CCIC's situation.[2]  In June and September of 2001, a CCIC employee performed internal loss reserve analyses and found that the artisan insurance business was beginning to deteriorate.  (First Am. Compl. ¶ 44.)  In October 2001, Delta commissioned an evaluation of itself and CCIC that included a "Risk Consideration" section.  This section warned that without "an increase in profitability or an injection of capital by the primary shareholder, [CCIC] may have to curtail its aggressive expansion plans or risk being downgraded by A.M. Best."[3]  (First Am. Compl. ¶ 42.)  This warning proved to be quite prescient.  *See infra* ¶ 34.  CCIC filed an application with the California Department of Insurance to increase rates on its artisan insurance by 16.2% in December of 2001.  Plaintiff alleges that "the indication in the rate filing was that CCIC needed to increase its California premium rates by 43.6%."  (First Am. Compl. ¶ 51.)

{31}   In January 2002, Haigh met with two of CCIC's California brokers and was informed that CCIC had the opportunity to expand its artisan insurance business in California, but that it "did not have sufficient capital and surplus to support the increased premiums and writings."  (First Am. Compl. ¶43.)

{32}   In February 2002, the California Department of Insurance approved a 16.2% rate increase for CCIC's artisan insurance pursuant to CCIC's December 2001 application.  (First Am. Compl. ¶ 51.)  CCIC also had another loss reserve analysis performed in February 2002.  The analysis

> pointed out that the loss experience of the Artisans Insurance business in California was deteriorating, that loss ratios were expected to continue to get worse for the Artisan Insurance in California, and that the mishandling of claims on the Artisans Insurance program by CIA, the adjusting firm owned or controlled by Rick Custard, was making it difficult to accurately predict the future expected losses from the program.

(First Am. Compl. ¶ 45.)

---

[2] The allegations are generally based on actions occurring after March 1, 2001—the critical date for statute of limitations purposes.

[3] A.M. Best is a rating organization for insurance companies.

> Based on these warning signs, Plaintiff alleges that the Custards and Haigh knew, or in the exercise of reasonable care should have known, that early in 2002, at the latest, CCIC needed to significantly increase its reserves for expected losses on Artisans Insurance, needed to increase rates for Artisans Insurance in California, and needed to put controls on the volume of production from California brokers, and required additional capital and surplus if the premium volume continued to grow. Instead, no meaningful controls were instituted, and CCIC increased its premium writings in 2002 to almost double what they were in 2001.

(First Am. Compl. ¶¶ 47–48.)

{33} In June 2002, CCIC filed a second application for a rate increase with the California Department of Insurance. This application "sought a rate increase of 43.4% but included indications that CCIC needed to increase its rates by 52.3%." (First Am. Compl. ¶ 52.) Also in June 2002, A.M. Best informed Mr. Custard and Haigh that CCIC would lose its favorable rating unless it raised additional capital and reduced its losses on the California artisans insurance. (First Am. Compl. ¶ 53.) In the middle of 2002, Plaintiff alleges that Mr. Custard and Haigh "were informed that CIA was mishandling claims for CCIC, and that the charges made by CIA to CCIC were excessive." (First Am. Compl. ¶ 55.) According to Plaintiff:

> The reaction of Defendants Haigh and Rick Custard to the worsening situation of CCIC throughout 2002, and the A.M. Best warnings, was to seek to protect their personal interests, and the interests of CIA, instead of taking the steps which reasonably prudent officers and directors would have taken to protect CCIC and its policy holders.

(First Am. Compl. ¶ 54.) Plaintiff also alleges that Mr. Custard and Haigh's focus on the protection of their personal interests affected their efforts to raise additional capital for CCIC in 2002. Specifically, Plaintiff alleges the following:

> [D]espite the fact that publicly traded property and casualty insurance companies of a similar size to CCIC with comparable returns on equity traded at significant discounts to book value, Defendants Haigh and Rick Custard sought buyers and investors at an amount in excess of two times the book value of CCIC.

Additionally, Defendants Haigh and Rick Custard's money-raising efforts were based on projections of profitability which failed to recognize that such profitability could only be realized if: (a) fresh capital were injected into CCIC; (b) CCIC maintained its rating from A.M. Best; and (c) the loss development of the Artisan Business in California stabilized or decreased, and did not continue to deteriorate. None of these occurred, and it became impossible to attract any buyers or investors.

(First Am. Compl. ¶¶ 57–58.)

{34} In October 2002, the California Department of Insurance approved an 8.45% rate increase pursuant to CCIC's June 2002 application. (First Am. Compl. ¶ 52.) In November 2002, A.M. Best downgraded CCIC from an A- to a B+ rating. A.M. Best allegedly "would have taken steps to downgrade CCIC earlier in 2002 but for false and misleading representations by Defendants Haigh and Rick Custard that an infusion of capital was imminent." (First Am. Compl. ¶ 63.) Plaintiff further alleges that "[b]efore and following A.M. Best's decision to downgrade CCIC, Defendants Haigh and Rick Custard . . . took steps to conceal CCIC's true financial condition from the NCDOI." (First Am. Compl. ¶ 64.) Plaintiff cites as an example a November 19, 2002 e-mail from Haigh to NCDOI mischaracterizing CCIC's profits, loss ratios, and growth in the artisan insurance business. (First Am. Compl. ¶ 65.)

{35} As 2002 drew to a close, CCIC filed financial statements with NCDOI. Regarding these financial statements, Plaintiff alleges:

quarterly financial statements signed under oath by Defendants Haigh and Wendy Custard and filed with the NCDOI at the end of the second and third quarters of 2002 reported loss ratios and loss development on CCIC's Artisan Insurance in California which were misleading and deceptive.

(First Am. Compl. ¶ 67.) Mrs. Custard and Haigh signed CCIC's 2002 annual statement on February 28, 2003. Plaintiff alleges that the 2002 annual statement was known by Mrs. Custard and Haigh to be "materially inaccurate, as evidenced by the fact that CCIC's independent actuarial firm,

Ernst & Young, notified CCIC before the signing . . . and subsequent filing of the 2002 annual statement, that the reserves shown on the statement were not correct." (First Am. Compl. ¶ 70.)

{36} Ultimately CCIC was left in a position "where its writings were more than 17 times its surplus on a gross basis, and more than 8 times its surplus on a net basis." (First Am. Compl. ¶ 72.)

{37} CCIC was placed into administrative supervision by NCDOI in March 2003. (First Am. Compl. ¶ 73.) CCIC ceased writing new business on April 15, 2003 and the writing of renewal business on July 15, 2003. (First Am. Compl. ¶ 74.) CCIC's 2003 annual statement showed it to be insolvent by $41,443,484. (First Am. Compl. ¶ 75.) On April 2, 2004, CCIC was placed into liquidation. (First Am. Compl. ¶ 76.) The extent of CCIC's insolvency, if any, is hotly contested.

{38} Based on these allegations, Plaintiff seeks relief for (1) breach of fiduciary duty, (2) violation of section 58-7-200 of the General Statutes of North Carolina regarding diversion of corporate funds for personal use, (3) violation of section 58-19-60 of the General Statutes regarding a termination payment to Haigh after an order of rehabilitation had been entered against CCIC, and (4) unfair and deceptive trade practices under Chapter 75 of the General Statutes. Defendants have moved to dismiss only Plaintiff's first and fourth claims for relief under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure for failure to state a claim upon which relief may be granted.

B.

LEGAL STANDARD

{39} Defendants have moved to dismiss Plaintiff's first and fourth claims for relief for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. For purposes of a Rule 12(b)(6) motion to dismiss, the Court must treat the relevant allegations of Plaintiff's First Amended Complaint as if they were true. *See, e.g.*, *Hyde v. Abbot Labs.*, 123 N.C. App. 572, 575, 473 S.E.2d 680, 682 (1996). Statutes of limitation can form the basis for dismissal under Rule 12(b)(6) "if the face of the complaint

discloses that plaintiff's claim is so barred." *Long v. Fink*, 80 N.C. App. 482, 484, 342 S.E.2d 557, 559 (1986).

C.

ANALYSIS

1.

BREACH OF FIDUCIARY DUTY

{40} Defendants argue Plaintiff's claims for breach of fiduciary duty against the Custards and Haigh are barred by statutes of limitation. Ascertaining the appropriate limitations period in this case is a multi-step process. The starting point is section 58-30-130 of the General Statutes, which contains the limitations period for actions brought by the liquidator of an insurance company. The statute provides as follows:

> The liquidator may, upon or after an order for liquidation, within two years or such subsequent time period as applicable law may permit, institute an action or proceeding on behalf of the estate of an insurer upon any cause of action <u>against which the period of limitation fixed by applicable law has not expired at the time of the filing of the petition upon which such order is entered</u>.

N.C. Gen. Stat. § 58-30-130(b) (2005) (emphasis added). In other words, if the limitations period for a cause of action has expired at the time of the filing of the petition for liquidation, then the liquidator will be barred from bringing the action. In this case, Plaintiff filed the petition for liquidation of CCIC on March 1, 2004. (Defs.' Mot. Dismiss for Failure to State a Claim Ex. B.) Thus, Plaintiff can only bring claims for which the limitations period had not expired on March 1, 2004.[4]

{41} The Court must therefore determine whether Plaintiff's claims for breach of fiduciary duty were alive on March 1, 2004. The applicable limitations period for

---

[4] The Court notes that this action was timely filed within the two year limitations period mentioned in section 58-30-130. The Order of Liquidation was entered on April 2, 2004 (*see* Defs.' Mot. Dismiss Ex. C) and the Complaint was filed on March 31, 2006. The issue before the Court is whether the limitations period for the underlying alleged breaches of fiduciary duty had expired before the filing of the petition for liquidation on March 1, 2004.

breach of fiduciary duty by corporate officers and directors in North Carolina is three years. The general standards of conduct for both directors and officers are defined by statute. *See* N.C. Gen. Stat. §§ 55-8-30 (setting forth standards for directors), 55-8-42 (setting forth standards for officers). The applicable limitations period for liabilities "created by statute" is three years, "unless some other time is mentioned in the statute creating it." *Id.* § 1-52(2). Since the standards of conduct for corporate officers and directors arise out of the aforementioned statutes, and those statutes do not contain their own limitations periods, the Court concludes that the limitations period for breach of fiduciary duty is three years. *See Rich Food Servs., Inc. v. Rich Plan Corp.*, No. 5:99-CV-677-BR, 2002 U.S. Dist. LEXIS 27799, at *31–32 (E.D.N.C. Nov. 13, 2002) (finding that "N.C. Gen. Stat. § 55-8-30 [is a] statutorily-defined obligation[] and, as such, would be governed by the three-year statute of limitation in N.C. Gen. Stat. § 1-52(2)").

{42} Plaintiff argues "that it is not at all clear that the statute of limitations for breach of fiduciary duty is three years." (Pl.'s Mem. Opp. Defs.' Mot. Dismiss for Failure to State a Claim 7.) This position is not supported by the relevant statutes. The language of section 1-52(2) is clear in providing a three year limitations period for liabilities created by statute. It is also clear that the standards of care for corporate directors and officers are set forth in statutes, and that liability for failure to meet those standards of conduct is created by and based on the statutes. The plain language of these provisions points to a three year statute of limitations for breach of fiduciary duty. An ambiguous, ill-defined limitations period for breach of the standards of conduct for directors and officers would have a chilling effect on the willingness of individuals to serve in those capacities, and as such would be an unsound public policy. The legislature clearly adopted an unambiguous, defined statute of limitations.

{43} To be actionable here, any breach of fiduciary duty on the part of the Custards and Haigh would have had to occur in the three years preceding March 1, 2004. Therefore, only those alleged breaches of fiduciary duty occurring on or after March 1, 2001 are actionable by the liquidator. The actions complained of here

begin in 1998 and extend into 2004 when CCIC was placed in liquidation. Any breaches alleged to have occurred prior to March 1, 2001 are subject to dismissal. This includes the decision to expand into California, the arrangements made with California brokers, the decision to proceed as an admitted carrier, and the other claims which the Court has classified as essentially negligent management claims above. Breaches alleged to have occurred after March 1, 2001 are not subject to dismissal. These include allegedly false filings with NCDOI and false financial statements, as well as the increased business written in 2002 despite various warning signs that were known to Defendants.

{44} Plaintiff argues that none of its claims for breach of fiduciary duty are subject to dismissal "because the statute of limitations should be tolled under the doctrine of adverse domination." (Pl.'s Mem. Opp. Defs.' Mot. Dismiss 9.) Adverse domination consists of a "rebuttable presumption that the statute of limitations does not begin to run on an action against corporate directors so long as the board is controlled by the alleged wrongdoers." *Resolution Trust Corp. v. Bernard*, No. 2:94CV00475, 1995 U.S. Dist. LEXIS 12819, at *19 (M.D.N.C. Aug. 9, 1995). As the parties recognize, North Carolina's appellate courts have not adopted the doctrine of adverse domination. The decision as to whether or not to adopt the doctrine rests with the appellate courts.

{45} Plaintiff relies on the United States District Court's decision in *Bernard* in support of its argument that this Court should adopt the adverse domination doctrine. *Bernard* is similar to the present case in many ways. *Bernard* involved a savings and loan association known as Preferred Savings and Loan Association, Inc. ("Preferred"). *Id.* at *2. The defendants were former directors and officers of Preferred. *Id.* The Office of Thrift Supervision found Preferred to be in an unsound condition to conduct its business, and appointed the Resolution Trust Corporation ("RTC") as receiver. *Id.* RTC brought an action against the former directors and officers for, among other things, breach of fiduciary duty. *Id.* at *2–3. The defendants argued that the statute of limitations had run against RTC for these

claims, but the court ultimately concluded that "the adverse domination doctrine prevents RTC's claims from being barred by the statute of limitations." *Id.* at *25.

{46} In spite of these similarities, there are several key distinctions which render *Bernard* inapposite. There is a separate statute of limitations for actions against bank directors which requires that "actions must be brought within three years after the discovery by the aggrieved party of the facts upon which . . . the liability was created." N.C. Gen. Stat. § 1-33. As Judge Osteen noted, this statute "incorporates a 'discovery rule,' requiring that the cause of action not accrue until the facts supporting liability are discovered by the aggrieved party." *Bernard*, 1995 U.S. Dist. LEXIS at *6. The holding in *Bernard* is quite narrow, and must be viewed in the context of an action against bank directors. Judge Osteen did not conclude that North Carolina courts would adopt adverse domination in all cases. Rather, he found "that the North Carolina courts would adopt the adverse domination doctrine <u>in applying the discovery rule in § 1-33.</u>" *Id.* at *23 (emphasis added). The statutes at issue here, sections 55-8-30 and 55-8-42, do not incorporate a discovery rule as section 1-33 does. The reasoning and conclusion of *Bernard* therefore cannot be extended beyond section 1-33 to reach the statutes at issue here.

{47} Furthermore, the Court notes that even if the doctrine of adverse domination were applied to the facts of this case, it should not toll the statute of limitations for those breaches alleged prior to March 1, 2001 because those allegations indicate negligent management rather than breaches of the duty of loyalty. If the doctrine of adverse domination were applied, it should only apply to a cause of action for breach of fiduciary duty against a director of an insurance company asserted on behalf of policyholder for a breach of the duty of loyalty. Directors of banks and insurance companies have a duty to preserve the assets that are entrusted to them by depositors and policyholders and to avoid self-dealing or other breaches of the duty of loyalty which would reduce the assets available to meet the insurance company's obligations to its policyholders. That public policy does not extend to breaches of the duty of care which call into question decisions

involving the operation of the company that are free from conflicts of interest. No cause of action on behalf of policyholders exists for "negligent management" and there are no cases in North Carolina even intimating that such a cause of action exists. No rational business person would sit on the board of an insurance company if they were personally liable if the company's decision with respect to underwriting or investment proved faulty. The statutory scheme created by the legislature imposes duties upon directors of insurance companies that do not exist for directors in other industries. The legislature was specific in setting forth those obligations and it did not include among those obligations a duty of care running to policyholders.

{48} Similarly and consistently the doctrine of adverse domination would be applied to breaches of the duty of loyalty, not to claims of negligent management. There exists a distinct difference between board decisions made on the basis of self-interest and hidden from the public and those based on business judgment and openly disclosed.

{49} To draw a distinction here, the business decision to write artisan policies in California and the rates to be charged for those policies are quintessential business decisions subject to the business judgment rule. If in fact it turns out that those judgments were simply erroneous, there would be no basis for liability.

{50} However, Plaintiff has alleged more than bad business decisions with respect to actions after March 1, 2001. Plaintiff has alleged Defendants caused false or misleading financial statements and other documents to be filed with NCDOI. There is a fiduciary duty to policyholders not to mislead regulatory authorities charged with the protection of assets. The allegations in the First Amended Complaint with respect to actions in 2002 rise to the level of conscious disregard of the rights of policyholders. These allegation therefore support a cause of action for breach of fiduciary duty and are not subject to dismissal.

{51} The Court notes that the foregoing analysis would also apply in Georgia, where CCIC was domesticated until December 2001. The standard of conduct for directors and officers of Georgia corporations are also created by statute. *See* Ga.

Code Ann. §§ 14-2-830, -842 (LEXIS through 2007 legislation). Georgia has also rejected the adverse domination doctrine. *See Resolution Trust Corp. v. Artley*, 28 F.3d 1099, 1102–3 (11th Cir. 1994).

## 2.

## UNFAIR AND DECEPTIVE ACTS OR PRACTICES

{52} Plaintiff alleges that two categories of actions on the part of the Custards and Haigh constitute "unfair or deceptive acts or practices in or affecting commerce," which are declared unlawful in section 75-1.1 of the General Statutes. *See* N.C. Gen. Stat. § 75-1.1(a). The first category, which Plaintiff alleges to be unfair acts or practices, consists of the following:

> a. allowing CCIC to write over $47 million in premiums in the third and fourth quarters of 2002 when there was inadequate capital and surplus to support such writings, thereby injuring the policyholders and creditors of CCIC;
> b. allowing CCIC to write over $47 million in premiums in the third and fourth quarters of 2002 when there was no reasonable prospect for securing additional capital and surplus, and while Defendants Haigh and Rick and Wendy Custard pursued transactions intended to increase their personal wealth.

(First Am. Compl. ¶ 90.) The second category consists of the following allegations: (1) Defendants caused or failed to take steps reasonably prudent to prevent dissemination of "statements with respect to the business of CCIC and the conduct of CCIC's insurance business which were untrue, deceptive, or misleading, (2) Defendants signed or allowed the filing of "false statements of financial condition of CCIC with intent to deceive . . . public officials about the true financial condition of CCIC," and (3) made or allowed the making of

> false entries in the books, reports, and statements of CCIC with the intent to deceive public employees, agents, and examiners lawfully appointed to examine CCIC's condition and affairs, and public officials to whom CCIC was required by law to report, and who had authority by law to examine into CCIC's condition or into any of CCIC's affairs, and, with like intent, willfully omitted to make true entries of material

> facts pertaining to the business of CCIC in its books, reports, or
> statements of CCIC.

(First Am. Compl. ¶ 92.)

{53} As an initial matter, Defendants argue that Georgia law governs Plaintiff's fourth claim for relief, rather than section 75-1.1 of the North Carolina General Statutes. The Court finds that North Carolina law applies to these claims. In the summer of 2001, CCIC submitted a Petition for Redomestication to NCDOI. (First Am. Compl. ¶ 36.) The petition was approved by NCDOI on December 19, 2001. (First Am. Compl. ¶ 38.) Following redomestication, CCIC became a North Carolina corporation and NCDOI became CCIC's primary regulator. When a state has primary responsibility of oversight, the relationship between the state and the insurance company is strong. Given CCIC's voluntary decision to redomesticate in North Carolina, the Court finds that North Carolina law applies to Plaintiff's fourth claim for relief.

{54} Under section 75-1.1, "unfair or deceptive acts or practices in or affecting commerce" are declared to be unlawful. N.C. Gen. Stat. § 75-1.1(a). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. [A] party is guilty of an unfair act or practice when it engages in conduct that amounts to an inequitable assertion of its power or position. Moreover, an act or practice is deceptive if it has the capacity or tendency to deceive." *United Constr. Servs., Inc. v. Bellsouth Telecomm., Inc.*, 163 N.C. App. 657, 665–66, 594 S.E.2d 802, 807–8 (2004) (citations omitted).

a.

INCREASED UNDERWRITING ACTIVITY

{55} Plaintiff alleges CCIC's increased underwriting activity in the third and fourth quarters of 2002 is an unfair practice. Specifically, there are allegations that the Custards and Haigh either intentionally drove CCIC into insolvency or acted with a conscious disregard for the safety of policyholders for purposes of personal gain. (*See* First Am. Compl. ¶ 24, 29.) More facts are needed in order to flesh out a

standard for evaluating whether this alleged conduct gives rise to a cause of action under section 75-1.1. It would therefore be more appropriate to decide this issue at the summary judgment stage. However, the threshold for finding a cause of action will be high. Plaintiff's claim of unfair trade practices based on increased underwriting activity in 2002 is not subject to dismissal at this time.

b.

FALSE OR MISLEADING FINANCIAL STATEMENTS

{56} Plaintiff also alleges that the Custards and Haigh filed or failed to prevent the filing of false financial statements with the NCDOI, as well as making false statements about the condition of CCIC. Filing a false or misleading document with a government regulatory agency is clearly an act with the tendency to deceive, and states a cause of action for a violation of section 75-1.1.

{57} Plaintiff's claims of unfair trade practices based on the filing of false or misleading financial statements with NCDOI and the making of false or misleading statements about the condition of CCIC are not subject to dismissal.


IV.

CONCLUSION

{58} Based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED:

1. Defendants' Motion to Dismiss Plaintiff's claims for relief for breach of fiduciary duty arising out of business decisions made prior to March 1, 2001 is GRANTED.

2. Defendants' Motion to Dismiss Plaintiff's claims for relief for breach of fiduciary duty arising out of false or misleading statements regarding CCIC's financial condition and false or misleading filings with NCDOI is DENIED.

3. Defendants' Motion to Dismiss Plaintiff's claims for relief for unfair or deceptive acts or practices in violation of Chapter 75 arising after CCIC's redomestication in North Carolina is DENIED.

IT IS SO ORDERED, this the 8th day of August, 2007.